UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JOE FERNANDEZ,
      Petitioner,

vs.                          Case No.:  3:21cv598/LAC/EMT

SECRETARY, DEPARTMENT
OF CORRECTIONS,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

Petitioner Joe Fernandez (Fernandez) filed a counseled amended petition for writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 5).  Respondent (the State) filed an answer (ECF No. 12), with relevant portions of the state court record (ECF Nos. 12-1 through 12-21).  The State set forth the procedural history of Fernandez's state criminal case and indicated the § 2254 petition "would appear timely filed unless this Court should disagree" (ECF No. 12 at 22).  Fernandez filed a reply to the State's answer (ECF No. 16).

The court reviewed the procedural history set forth in Fernandez's amended § 2254 petition, the State's answer, and the state court record, and determined additional argument on the timeliness issue was required (see ECF No. 17).  The court directed the parties to brief the issue of whether Fernandez's state habeas

petition was "properly filed," within the meaning of 28 U.S.C. § 2244(d)(2), and if not, whether his § 2254 petition was untimely. The parties filed their briefs (ECF Nos. 18, 19). The State now asserts Fernandez's § 2254 petition is untimely (*see* ECF No. 18). Fernandez contends his § 2254 petition is timely, and even if the court finds otherwise, he is entitled to relief on his claims because he is actually innocent (*see* ECF No. 19).

After careful consideration of the timeliness issue, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases. It is further the opinion of the undersigned that the pleadings and attachments before the court show that Fernandez's § 2254 petition should be dismissed as untimely.[1]

## I.    BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF Nos. 12-1 through 12-21).[2] Fernandez was charged in the Circuit Court in and for Okaloosa County, Florida, Case No. 2013-

---

[1] The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).

[2] The court refers to the document numbers and page numbers automatically assigned by the court's electronic filing system.

CF-1809, by separate informations, with one count of attempted first degree felony murder with a weapon or firearm (Count 1) and one count of possession of a firearm by a convicted felon (Count 2) (ECF No. 12-1 (amended informations)).  On January 13–14, 2015, a jury trial was held on the attempted first degree murder count (ECF Nos. 12-2 through 12-4 (transcript of jury trial)).  The jury found Fernandez guilty as charged of attempted first degree felony murder with a weapon or firearm (ECF No. 12-4 at 84–85 (excerpt of trial transcript announcing verdict)).  The jury specifically found that during commission of the crime, Fernandez carried, displayed, used or threatened to use a firearm, and that Fernandez discharged a firearm causing serious bodily injury (*id.*).  After the verdict was announced, the trial court sentenced Fernandez as a prison releasee reoffender, to life in prison with pre-sentence credit of 868 days (ECF No. 12-4 at 90 (excerpt of trial transcript pronouncing sentence); ECF No. 12-8 at 2–7 (judgment and sentence)).

On January 15, 2015, the day after trial concluded on Count 1, Fernandez entered a no contest plea to Count 2 (ECF No. 12-7 (transcript of plea and sentencing hearing)).  The court conducted a colloquy, accepted the plea, and sentenced Fernandez to ten years in prison, with a three-year minimum mandatory, to run

concurrently with the sentence on Count 1 (ECF No. 12-7 (transcript of plea and sentencing hearing); ECF No. 12-8 at 12–17 (judgment and sentence)).

Fernandez appealed the judgment to the Florida First District Court of Appeal (First DCA), Case No. 1D15-725 (*see* ECF No. 12-10 (Fernandez's initial brief); ECF No. 12-11 (the State's answer brief); ECF No. 12-12 (Fernandez's reply brief)). The First DCA affirmed the judgment per curiam without written opinion on February 24, 2016 (ECF No. 12-13 (decision and mandate)). *Fernandez v. State*, 214 So. 3d 669 (Fla. 1st DCA 2016) (Table).

On February 22, 2017, Fernandez filed a counseled motion for post-conviction relief in the state circuit court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (ECF No. 12-14 at 16–18 (Rule 3.850 motion)). Fernandez subsequently filed a second amended Rule 3.850 motion (*id.* at 132–72 (second amended Rule 3.850 motion)). The circuit court summarily denied three of Fernandez's five claims (Grounds 1, 2, and 4) and set an evidentiary hearing on one claim (Ground 3) (*see* ECF No. 12-14 at 212–24 (order)). Following the evidentiary hearing, the circuit court entered a final order denying the second amended Rule 3.850 motion in its entirety (ECF No. 12-14 at 367–76 (final order)). Fernandez appealed the decision to the First DCA, Case No. 1D19-340 (*see* ECF No. 12-15

(Fernandez's initial brief); ECF No. 12-16 (the State's answer brief)). The First DCA affirmed per curiam without written opinion on June 2, 2020, with the mandate issuing on June 30, 2020 (ECF No. 12-17 (decision and mandate)). *Fernandez v. State*, 296 So. 3d 392 (Fla. 1st DCA 2020) (Table).

On January 17, 2020, Fernandez filed a pro se habeas petition in the state circuit court's civil division, Case No. 2020-CA-267 (ECF No. 12-18 at 19–163 (habeas petition and attachments)). The court transferred the petition to Fernandez's criminal case (*see id.* at 17–18 (order transferring petition)). In the criminal case, the court construed Fernandez's habeas petition as a Rule 3.850 motion and summarily denied it as untimely (ECF No. 12-18 at 164–69 (order and attachments)). Fernandez appealed the decision to the First DCA, Case No. 1D20-1558 (ECF No. 12-19 (Fernandez's initial brief); ECF No. 12-20 (State's notice of non-briefing)). The First DCA affirmed per curiam without written opinion on December 17, 2020, with the mandate issuing on January 7, 2021 (ECF No. 12-21 (decision and mandate)). *Fernandez v. State*, 308 So. 3d 569 (Fla. 1st DCA 2020) (Table).

Fernandez commenced this federal habeas action by filing a counseled § 2254 petition on April 8, 2021 (*see* ECF No. 1).

II.    DISCUSSION

**A.    Fernandez's § 2254 petition is untimely.**

A one-year period of limitation applies to the filing of a habeas petition by a person in custody pursuant to a state court judgment.  *See* 28 U.S.C. § 2244(d)(1). The limitation period runs from the latest of:

> (A)   the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).   The statute also includes a tolling provision, which provides, "the time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation . . . ."  *See* 28 U.S.C. § 2244(d)(2).

The State contends, and Fernandez does not dispute, the appropriate statutory trigger for the federal limitations period in this case is the finality date of the judgment, pursuant to § 2244(d)(1)(A) (*see* ECF No. 18 at 9–10; ECF No. 19 at 1– 2). Applying that trigger, Fernandez's judgment of conviction becomes final, for purposes of § 2244(d)(1)(A), upon expiration of the 90-day period in which he could have sought direct review of his conviction in the United States Supreme Court. The 90-day period runs from the date of entry of the judgment sought to be reviewed. *See* U.S. Sup. Ct. Rule 13; *Chavers v. Sec'y, Fla. Dep't of Corr.*, 468 F.3d 1273, 1275 (11th Cir. 2006). Calculating the finality date in Fernandez's case, the 90-day period for seeking certiorari review in the Supreme Court was triggered by the First DCA's affirmance in the direct appeal on February 24, 2016, and it expired ninety days later, on May 25, 2016. The federal limitation period commenced the next day, on May 26, 2016.[3]

The limitation period ran untolled for a period of **272 days** until February 22 2017, the date Fernandez filed his Rule 3.850 motion. The federal clock stopped

---

[3] Federal Rule of Civil Procedure 6(a) provides that in computing any time specified in any statute that does not specify a method of computing time, the day of the event that triggers the time is excluded, and the last day of the period is included. *See* Fed. R. Civ. P. 6(a)(1); *see also Washington v. United States,* 243 F.3d 1299, 1301 (11th Cir. 2001) (Rule 6 applies to calculation of one-year statute of limitations under AEDPA).

until June 30, 2020, the date the First DCA issued the mandate in the post-conviction appeal.  *See Nyland v. Moore*, 216 F.3d 1264, 1267 (11th Cir. 2000).

The timeliness of Fernandez's federal habeas petition boils down to whether his state habeas petition (filed January 17, 2020, as noted *supra*) qualified for statutory tolling under § 2244(d)(2).  The state court denied Fernandez's petition, which it construed as a Rule 3.850 motion, as untimely (ECF No. 12-18 at 165–67).

In *Artuz v. Bennett*, the Supreme Court held that time limits on post-conviction petitions are conditions to filing, such that an untimely petition would not be deemed "properly filed" under § 2244(d)(2).  *Artuz*, 513 U.S. 4, 8, 11 (2000).  In *Pace v. DiGuglielmo*, the Court answered the question reserved by the *Artuz* Court, "whether the existence of certain exceptions to a timely filing requirement can prevent a late application from being considered improperly filed."  *Pace*, 544 U.S. 408, 413 (2005) (citing *Artuz*, 513 U.S. at 8 n.2).  The *Pace* Court held that the existence of exceptions did not matter:  "When a postconviction petition is untimely under state law, 'that [is] the end of the matter' for purposes of § 2244(d)(2)."  *Pace*, 544 U.S. at 414 (quoting *Carey v. Saffold*, 536 U.S. 214, 226 (2002)).  The Supreme Court subsequently clarified that a prisoner's untimely state post-conviction was not

"properly filed" regardless of the state time limit's nonjurisdictional status. *Allen v. Siebert*, 552 U.S. 3, 7 (2007).

In *Sweet v. Sec'y, Dep't of Corr.*, the Eleventh Circuit affirmed the dismissal of a § 2254 petition as time-barred, holding that an untimely state post-conviction motion is not "properly filed" even if the state court denied the motion on alternative grounds. 467 F.3d 1311, 1318 (11th Cir. 2006). In that case, the state trial court dismissed Sweet's motion as "untimely and facially insufficient," and, alternatively, as without merit in light of the Florida Supreme Court's rejection of a similar claim in other cases. *Id.* at 1313–14. The district court dismissed Sweet's § 2254 petition as untimely, finding that his Rule 3.850 motion did not toll the federal limitations period. *Id.* at 1314. On appeal, citing *Artuz* and *Pace*, the Eleventh Circuit held that the state court's alternative finding that Sweet's claim was without merit did not render the Rule 3.850 motion "properly filed" because, "when a state court unambiguously rules that a post-conviction petition is untimely under state law, we must respect that ruling and conclude that the petition was not 'properly filed' for the purposes of § 2244(d)(2), regardless of whether the state court also reached the merits of one of the claims." *Id.* at 1318.

Fernandez argues that in order for this court to find that the state petition/motion was untimely, the state court's ruling on the timeliness issue must be "unambiguous" (*see* ECF No. 19 at 6–7). Fernandez argues the state court's untimeliness ruling was not unambiguous, because "the court ruled on the meris of the Petitioner's motion when it found that the Petitioner's claim does not challenge a fundamental defect in the information" (*id.*). Fernandez further argues the state court did not dismiss the petition/motion with prejudice as untimely; instead, the court simply denied it (*id.*). Fernandez cites *Ousley v. Fla. Dep't of Corr.*, 269 F. App'x 884, 886 (11th Cir. 2008) in support of his argument (*id.*).

In *Ousley*, the petitioner argued that the state court erroneously construed his "Motion for Relief from Judgment" as a successive Rule 3.850 motion instead of a state habeas petition, and if the court had construed it as a state habeas petition, it would have been "properly filed" under § 2244(d)(2). *Ousley*, 269 F. App'x at 884–85. In the first part of the state court's order denying Ousley's second Rule 3.850 motion, the state trial court found that Ousley failed to allege any new grounds or newly-discovered evidence. *See id.* at 886. In the second part, the state court alternatively found that the motion was successive. *Id.* The Eleventh Circuit held "[d]espite the ambiguity in the state court's order regarding the timeliness of the

Rule 3.850 motion, . . . we need not resolve this issue" because Ousley "does not contest and, indeed, appears to concede the fact that his motion, construed as a second Rule 3.850 motion, was untimely under state law." *Id.* at 888. The Eleventh Circuit also rejected Ousley's assertion that the state court should have construed his motion as a state habeas petition, noting that a Florida prisoner may not use a habeas petition to collaterally attack his conviction or sentence, and that Rule 3.850 was the primary vehicle for post-conviction relief. *Id.* at 887.

For starters, the court rejects Fernandez's assertion that the state court ruled on the meris of his second Rule 3.850 motion when it found that his claim did not challenge a fundamental defect in the information. The court's finding that Fernandez did not allege a fundamental defect in the information was part of its timeliness determination. The court set out the time requirements of Rule 3.850(b) and noted that a claim of lack of subject matter jurisdiction, including a claim that the information was fundamentally defective, was not subject to those time requirements (ECF No. 12-18 at 165–66). The court went on to expressly hold that Fernandez's Rule 3.850 motion was filed beyond the two-year time limitation, and "[a]lthough Defendant alleges that the information does not separately charge him with the underlying felony relied upon to prove attempted first-degree felony

murder, he does not allege a fundamental defect in the information" (*id.* at 166).  The court concluded, "Consequently, Defendant's motion should be denied as untimely." (*id.* at 167).

The state court's consideration of the issue of whether Fernandez's motion fell within an exception to the time limitation of Rule 3.850(b) did not render its determination of untimeliness ambiguous.  *See Jones v. Sec'y, Fla. Dep't of Corr.*, 906 F.3d 1339, 1351–53 (11th Cir. 2018) (rejecting the argument that a post-conviction application that has been deemed untimely by the state court may still be considered "properly filed" as long as the motion merely alleges it falls within an exception).  The state court's untimeliness determination "ends the matter" for purposes of § 2244(d)(2).

Having determined Fernandez's state habeas petition, construed as a second Rule 3.850 motion, did not qualify for statutory tolling, the federal limitation period re-commenced on July 1, 2020 (the day after the First DCA issued the mandate in the first post-conviction appeal) and expired **93 days** later, on October 2, 2020 (**272 days + 93 days = 365 days**).  Fernandez's § 2254 petition, filed April 8, 2021, is untimely.

**B.    Fernandez is not entitled to federal review of his claims through the "actual innocence" exception.**

Fernandez argues he is entitled to federal review of his claims through the "actual innocence" exception to the time bar (*see* ECF No. 19 at 7–10).

The Supreme Court has consistently reaffirmed the existence and importance of a "fundamental miscarriage of justice" exception to procedural and time bars. *See Schlup v. Delo*, 513 U.S. 298, 321 (1995) (citations omitted). The Court recognized that a "credible showing of actual innocence" provides a "gateway" through which a petitioner may pursue his federal habeas claims on the merits notwithstanding his failure to file his habeas petition within the statute's otherwise applicable limitations period. *McQuiggin v. Perkins*, 566 U.S. 386 (2013). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623–24 (1998) (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)). To pass through this gateway, a petitioner must satisfy the standard for actual innocence articulated by the Supreme Court in *Schlup*. Under *Schlup*, a petitioner must show that, in light of newly presented evidence, "it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt," *id.* at 327, or, to remove the double negative, "that more likely than not any reasonable juror would have reasonable doubt," *House v. Bell,* 547 U.S. 518, 538 (2006).

*Schlup* makes clear that, "[t]o be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." 513 U.S. at 324. This new evidence must do more than counterbalance the evidence that sustained the petitioner's conviction. *See Sibley v. Culliver*, 377 F.3d 1196, 1207 (11th Cir. 2004) (concluding that even if new evidence showed that the murder victim was the aggressor, "a reasonable juror could still quite possibly have concluded that [petitioner] acted with murderous intent, rather than out of self-defense"). The new evidence must be so significant and reliable that, considered with the trial record as a whole, it "undermine[s] confidence in the result of the trial." *Schlup*, 513 U.S. at 327 (internal quotation marks omitted).

Fernandez's counsel does not specify any "new reliable evidence" supporting Fernandez's actual innocence claim and instead simply asserts Fernandez's sworn allegations in his amended § 2254 petition demonstrate his innocence (*see* ECF No. 19 at 10). The only allegations relating to "new" evidence (i.e., evidence not presented to the jury) are Fernandez's allegations in Ground Five concerning defense counsel's failure to prepare for trial and present all evidence supporting his defense

theory, which was that the victim of the shooting, Ms. Sheffield, misidentified Fernandez as the man who shot her outside her home, and law enforcement "set him up" as the shooter by failing to fully investigate Jeremiah Rodriguez as a suspect, fabricating statements of the victim and witnesses in the police reports, and planting a firearm under Fernandez's body when they apprehended him in Miami (*see* ECF No. 5 at 15–16).

As background, the court will summarize the evidence presented at Fernandez's trial (*see* ECF No. 12-2 at 90–121). Tamara Sheffield grew up with Kiera Bethune and knew that Bethune had a boyfriend. On August 1, 2012, Ms. Sheffield saw Kiera at the laundromat. Kiera asked Sheffield to loan her $400, and Sheffield agreed to loan Kiera some money. Ms. Sheffield went home from the laundromat and expected Kiera to come to her home to get the money, but Kiera's boyfriend showed up instead. As Ms. Sheffield was backing out of the yard in her son's car, Kiera's silver car pulled in behind her. Ms. Sheffield walked over the driver's side of Kiera's car, and Kiera's boyfriend rolled down the window, referenced Kiera or "my old lady," and said he wanted to borrow money. Ms. Sheffield said she would loan them some money, but not $400. Kiera's boyfriend got out of the car, walked to the passenger side, opened the door, and said he would

give Sheffield a ride.  Ms. Sheffield said no.  Kiera's boyfriend asked if she could

give them $600 or $700.  Sheffield responded she did not have that much money.

Kiera's boyfriend  said, "Well, bitch, give me everything."  He then walked around

the car, stood face-to-face with Sheffield, said "Bitch, look me in my face or I'll kill

you," and then shot her in the chest, right arm, right leg, shoulder, wrist, and left

arm.  Ms. Sheffield testified after law enforcement arrived at the scene, she pointed

to Dexter Pierson's mother (Cynthia Bethune) and said, "her daughter's boyfriend"

did it.  Ms. Sheffield testified while she was in the hospital, law enforcement showed

her a photo line-up, and she identified the man who shot her (Fernandez).  Ms.

Sheffield also identified Fernandez in court as the shooter.

On cross-examination, Ms. Sheffield testified she did not recall providing a

physical description of Kiera Bethune's boyfriend to law enforcement.  She testified

she could not recall whether she told law enforcement the shooter had black hair,

gold teeth, tattoos, and was Latino.  Defense counsel questioned Ms. Sheffield about

the color of the firearm:

> Q.  Do you remember at a deposition where you identified that
> firearm as silver or gray?
>
> A.  Yeah. I said it was silver or gray.
>
> Q.  And that firearm was pointed right at your face?

A.  He told me, bitch, I'll kill you.

Q.  And you saw that gun specifically; you know that there was
a gun involved?

A.  Yeah. I got shot.  Yeah, there was a gun.

Q.  And you know that that was a silver or gray firearm?

A.  Yeah.  I want to say silver or gray.

(ECF No. 12-2 at 112–13).

On re-direct examination, Ms. Sheffield testified when Fernandez shot her,
she was in the process of turning around to walk away (ECF No. 12-2 at 120–21).
She testified she saw the gun for only a split second.

Other witnesses testified they saw the argument outside Ms. Sheffield's home.
Mark Hamrick testified he saw the argument and identified Fernandez in court as
the man who was arguing with Ms. Sheffield (ECF No. 12-2 at 122–30).

Zach Price saw the argument and the shooting (ECF No. 12-2 at 131–39).  Mr.
Price described the man's car as gray.  Price identified the shooter in a photo line-
up (Fernandez).  Price also identified Fernandez in court as the shooter.

Trent Mitchell saw Ms. Sheffield fall into the road, and a man run into a gray
or silver car and drive away (ECF No. 12-2 at 136–45).

Case No.:  3:21cv598/LAC/EMT

Deputy Marcus O'Sullivan arrived at the scene of the shooting, and Ms. Sheffield pointed to a bystander, Dexter Pierson, and said the shooter was Mr. Pierson's brother-in-law (ECF No. 12-2 at 146–53).  Deputy O'Sullivan spoke to Pierson, and Pierson gave him the name "J."  Deputy O'Sullivan testified that officers learned the suspect and the silver vehicle were seen at 724-D Greenwood Avenue, so he went to that address.  O'Sullivan testified the suspect was gone, but the vehicle was there and was searched.

Deputy Kevin Kirkpatrick also spoke with Dexter Pierson, who told him "J" dated his sister Kiera Bethune (ECF No. 12-2 at 165).  Deputy Kirkpatrick testified Cynthia Pierson, the mother of Kiera Bethune and Dexter Pierson, arrived at the scene of the shooting and said Kiera dated "J."

Investigator Robert Grappone arrived at the scene of the shooting and obtained a description of the shooter's vehicle as a gray or silver Sebring (ECF No. 12-3 at 4–15).  Grappone went to Greenwood Avenue, and Cynthia Pierson gave officers permission to search her residence.  Investigator Grappone testified officers found a Western Union Moneygram in the name of Jeremiah Fernandez. Investigator Grappone testified Rodriguez was also known as "J."  Grappone testified officers met with Jeremiah Rodriguez at the Crestview police station.

Grappone testified Rodriguez's photo was included in photo line-ups shown to six or seven witnesses, and nobody identified him.  Investigator Grappone testified the other potential suspect known as "J" was Joe "Johnny" Fernandez.  Grappone testified he included Fernandez's photo in the line-ups, and every witness, including Ms. Sheffield, identified him.  Investigator Grappone spoke with people in Crestview and learned that Fernandez borrowed Kiera's vehicle, which was the vehicle located at Greenwood Avenue.  Grappone also learned that Kiera and Fernandez had left the area and gone to Miami.

On cross-examination, Investigator Grappone testified he was the lead investigator in the case and did not recall that there was any relevant fingerprint or DNA evidence in the case (ECF No. 12-3 at 22–33).  Grappone testified bullets and bullet fragments collected from Ms. Sheffield's body were sent for analysis, but none of them matched the firearm recovered from Fernandez when he was arrested in Miami.  Investigator Grappone testified Jeremiah Rodriguez was investigated as a suspect because he matched the physical description provided by witnesses, i.e., Hispanic or black male with gold teeth.  Defense counsel questioned Grappone about why he focused on Fernandez as a suspect but not Jeremiah Rodriguez:

Q [by defense counsel].  Based on information collected by officers on the scene, collectively, or at your direction, you chose a particular suspect?

A.  We were given a name of J, who was dating, at the time, Kiera, who owned the vehicle.  And we spoke to one of her relatives [Dexter Pierson] on the scene.  And yes, that's where our direction went at that point.

Q. So you were told—not you.  Someone in your—someone that conducted investigation was told that J is involved in this case?

A. Yes.

Q. How did you follow-up to substantiate J's involvement in this case?

A.  We started off looking for J to see who he was.  We knew he was dating Kiera Bethune.  We spoke to her family.  One of them told us he was known as Johnny.  We found the paperwork in the house that said Johnny.  We then followed it.  Somebody had told us that he was known to hang around Crestview and he had a child with a woman up in Crestview.  We then followed our lead up there.  We spoke to her and she told us—this was after we spoke about Mr. Rodriguez first and followed that lead until it went nowhere.  Then we went back and followed Mr. Fernandez' lead and that's when we spoke to his girlfriend, who said he was there that night and needed to borrow the car because he needed to get out of town.

Q. Why did the Ramirez lead nowhere?

A. Why did who lead nowhere?

Q. Ramirez, Rodriguez?

Case No.:  3:21cv598/LAC/EMT

A.  It lead nowhere [sic] because nobody picked him out of the photo line-up.  It obviously wasn't him.

Q.  You stated you showed everyone the photo line-up of Mr. Rodriguez?

A.  We showed about six or seven people who had been on the scene, yes.

(ECF No. 12-3 at 25–26).  Defense counsel asked Grappone if Jeremiah Rodriguez provided officers with any information about Fernandez or otherwise "pointed you in the direction of" Fernandez, and Grappone responded no.  Investigator Grappone testified Rodriguez had an alibi that he was in Crestview all day on the day of the shooting (witnesses testified the shooting occurred in Fort Walton Beach), and Rodriguez "didn't know any of the people involved" (*id.* at 32).  Grappone testified he did not take fingerprints or DNA samples from Jeremiah Rodriguez, and he he did not include Jeremiah Rodriguez's photo in the line-up shown to Ms. Sheffield because none of the other witnesses picked out Rodriguez, there was no tie between Rodriguez and Kiera Bethune, and Ms. Sheffield told an officer at the scene that the shooter was Kiera Bethune's boyfriend (*id.* at 28).

Kristie Hoffman, a crime scene technician, testified she collected six .45 caliber shell casings from the scene of the shooting (ECF No. 12-3 at 51–72).  Ms. Hoffman processed Ms. Sheffield's car for fingerprints and took swabs of certain

areas for DNA comparison.  Ms. Hoffman also processed the Sebring.  Hoffman

testified she recovered Kiera Bethune's driver's license and a laundry basket with

clothing, among other items, from the Sebring.  Hoffman also processed the Sebring

for fingerprints and took swabs of certain areas for DNA comparison, including a

swabbing of a red substance.  Ms. Hoffman also collected buccal swabs from

Fernandez.  Ms. Hoffman testified the only evidence she sent to the Florida

Department of Law Enforcement for testing were the DNA swabs from a red

substance from the Sebring and the bullet casings and fragments.  Ms. Hoffman

testified Investigator Grappone decided what materials were sent to the FDLE.

Kiera Bethune Fernandez testified she was dating Fernandez on August 1,

2012, and they were married on March 22, 2013 (ECF No. 12-3 at 75–88).  Ms.

Bethune testified she and Fernandez were living with her mother on Greenwood

Avenue on August 1, 2012.  Bethune testified she had a silver Sebring, and

Fernandez occasionally drove it.  Bethune testified her mother was asking her and

Fernandez for money, and eventually asked the two of them to leave her home.  Ms.

Bethune testified Fernandez had her car on August 1, 2012.  Bethune testified she

went to the laundromat with her grandmother and saw Ms. Sheffield there.  Bethune

denied that she asked Sheffield for money.  Bethune testified she left the laundromat

and went to her mother's house. Bethune testified Fernandez arrived at her mother's house in her vehicle and parked it behind a fence, which was not the usual parking spot. Bethune testified Fernandez suggested they go to Miami, so the two of them went to Miami that night in Fernandez's "baby mom's car." Bethune testified the "baby mom" lived in Crestview.

Chris Barther worked in the Fugitive Task Force of the United States Marshals Service in Miami (ECF No. 12-3 at 89–100). Barther was notified Fernandez was a fugitive living in a particular apartment complex. Barther conducted surveillance outside the apartment complex on August 31, 2012, and Fernandez walked by Barther's vehicle, made eye contact, and ran. Barther testified Fernandez was apprehended after a brief exchange of gun fire. Barther testified Fernandez was on the ground, and a firearm was on the ground "kind of away from him." Barther testified the location of the firearm was not unusual, because task force members are trained to make weapons inaccessible to fugitives when they are apprehended. Barther never saw Fernandez with the firearm and never heard him fire any shots.

Jodlyn Antoine, a police officer with the Miami police department, testified he was part of the "perimeter" set up by the Marshals Service and the police department near the apartment complex (ECF No. 12-3 at 115–28). Officer Antoine

saw Fernandez running from behind a house, so he ran towards Fernandez, drew his weapon, identified himself as "police," and ordered Fernandez to stop. Antoine testified Fernandez pointed a firearm at him and fired four shots. Officer Antoine returned fire, and Fernandez fell to the ground. Antoine testified he held Fernandez at gunpoint until other officers arrived. Antoine identified a .45 caliber Springfield as the firearm Fernandez was carrying and identified Fernandez in court as the shooter. The firearm was admitted into evidence.

Esteban Abreu testified he was a police officer in Miami (ECF No. 12-3 at 131–35). Officer Abreu was involved in apprehending Fernandez. Officer Abreu heard shots fired and found Fernandez on the ground with Officer Antoine holding Fernandez at gunpoint. Abreu saw a weapon next to Fernandez with a open slide, so he kicked it away and handcuffed and searched Fernandez for other weapons.

Sharan Plotkin, a crime scene analyst for the Miami Police Department, testified she recovered a .45 caliber Springfield and a .40 caliber Springfield from the scene of Fernandez's apprehension (ECF No. 12-3 at 135–45). Ms. Plotkin testified the .40 caliber Springfield belonged to Officer Antoine. Ms. Plotkin photographed the .45 caliber Springfield and swabbed it for possible DNA. Ms. Plotkin also "fumed" the firearm for fingerprints, but "the firearm did not yield

results."  Ms. Plotkin securely packaged the firearm and it was stored until it was eventually sent it to Okaloosa County authorities.

Jennifer Bellamy, a supervisor with the Okaloosa County crime scene evidence unit, testified she received the firearm from Miami and sent it to the Florida Department of Law Enforcement (FDLE) for analysis (ECF No. 12-3 at 147–50).

Marvin Stephens, a crime lab analyst in the FDLE's latent fingerprint section, testified he analyzed the bullet casings collected from the scene of Ms. Sheffield's shooting and the firearm collected from the scene of Fernandez's apprehension, but was not able to identify any fingerprints (ECF No. 12-3 at 151–69).  .

Jennifer Kay, a crime lab analyst in the FDLE's biology section, testified she compared DNA swabbings from the grips and slided magazine of a Springfield handgun and buccal swabs from Fernandez (ECF No. 12-3 at 169–79).  Ms. Kay testified Fernandez was excluded as contributing to a mixture of DNA found on the firearm.  Ms. Kay's report (State's Exhibit 49) was admitted into evidence.

Elissa McLaughlin, a crime lab analyst in the FDLE's firearm section, testified she examined the Springfield firearm, the magazine, six fired bullet casings, one bullet, and a bullet fragment (ECF No. 12-3 at 181 through ECF No. 12-4 at 10).  Ms. McLaughlin testified the "class characteristics" of the bullet matched *a*

Springfield firearm, but the "individual characteristics" of the bullet were insufficient to match with the *specific* Springfield firearm she examined. Ms. McLaughlin compared the six fired bullet casings with "test fires" from the firearm and determined the casings were fired from the firearm. Ms. McLaughlin's report was admitted into evidence as State's Exhibit 64.

In the context of this trial evidence, the court will evaluate Fernandez's actual innocence claim. As previously discussed, Fernandez's actual innocence claim is based on his allegations that law enforcement "set him up" as the shooter by failing to fully investigate Jeremiah Rodriguez as a suspect, fabricating statements of Ms. Sheffield and witnesses in the police reports, and planting the firearm under Fernandez's body when he was apprehended in Miami

With respect to Jeremiah Rodriguez, Fernandez alleges law enforcement failed to test Rodriguez's hands for gun powder residue and failed to test a pair of gold dental cast teeth impressions (apparently collected from the Sebring) for the presence of Rodriguez's DNA.[4] Fernandez has not proffered any evidence suggesting that the results of either type of testing would have implicated Mr.

---

[4] Fernandez alleges defense counsel failed to present the jury with evidence that law enforcement collected a pair of gold dental cast teeth impressions (top and bottom teeth) from the Sebring but never tested them (*see* ECF No. 5 at 16).

Rodriguez.  Moreover, the trial evidence showed that Rodriquez was ruled out as a suspect not because he did not have gold teeth when the police interrogated him, but because no evidence indicated he knew Keira Bethune, none of the witnesses identified Mr. Rodriguez in photo lineups, and Mr. Rodriquez had a complete alibi that placed him in another location the entire day of the shooting.

Fernandez also alleges law enforcement fabricated witness statements in the police report.  Fernandez alleges the police reports stated Ms. Sheffield described the shooter as having gold teeth, and a law enforcement officer testified at trial that he was "told" on the day of the offense that the shooter had gold teeth.  Fernandez alleges Ms. Sheffield testified at trial she did not recall mentioning gold teeth to law enforcement, and she did not recall that the shooter had gold teeth.  Fernandez's allegations do not implicate any "new evidence"—the jury heard Ms. Sheffield testify she did not recall describing the shooter as having gold teeth.  Fernandez's allegations on this subject to do not qualify as "new reliable evidence" of his actual innocence.

Fernandez alleges additional evidence of a "set up" by law enforcement is the fact that the police reports included eye witnesses' descriptions of the shooting which were more detailed than the trial testimony of these witnesses.  Fernandez

does not identify any particular witness or describe the alleged discrepancies between the trial testimony and statements reported in the police reports. Further, the mere fact that witnesses testified to fewer details at trial than was indicated in the police reports does not, alone, suggest the police reports were fabricated. Further, the fact that witnesses' trial testimony was less detailed than statements included in the police reports does not necessarily undermine the credibility of the witnesses' trial testimony or suggest Fernandez was not the shooter. Fernandez's allegations on this subject do not support an actual innocence claim.

Fernandez alleges more evidence of a "set up" is the fact that neither his blood nor his DNA was found on the firearm discovered under his body when police apprehended him in Miami. This is not "new evidence." The jury was aware, from Ms. Kay's testimony, that Fernandez's DNA was not on the firearm.

Fernandez additionally alleges the firearm found under his body was black, whereas Ms. Sheffield testified the firearm used by the shooter was silver/gray. Again, the jury was aware of this discrepancy. The firearm was admitted into evidence, so the jury was aware of its color. The jury also heard Ms. Sheffield testify the firearm was silver or gray, and on re-direct examination, she clarified she saw

the firearm only for a split second. Fernandez's allegations on this subject do not involve any "new evidence."

As discussed *supra*, *Schlup* requires Fernandez to support his actual innocence claim with "new reliable evidence" of his actual innocence. None of Fernandez's allegations satisfy that standard. Fernandez has not demonstrated he is entitled to federal review of his time-barred claims through the fundamental miscarriage of justice exception.

III.    CONCLUSION

Fernandez's federal habeas petition was not filed within the one-year statutory limitations period; and he has not shown he is entitled to federal review of his habeas claims through the "actual innocence" gateway recognized in *McQuiggin*. Therefore, the amended habeas petition should be dismissed with prejudice as untimely.

IV.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing

required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a).  A timely notice

of appeal must still be filed, even if the court issues a certificate of appealability.  28

U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has

made a 'substantial showing of the denial of a constitutional right.'"  *Miller-El v.*

*Cockrell*, 537 U.S. 322, 336  (2003) (quoting § 2253(c)(2)).  "At the COA stage, the

only question is whether the applicant has shown that 'jurists of reason could

disagree with the district court's resolution of his constitutional claims or that jurists

could conclude the issues presented are adequate to deserve encouragement to

proceed further.'"  *Buck v. Davis*, 137 S. Ct. 759, 773  (2017) (citing *Miller-El*, 537

U.S. at 327).   The petitioner here cannot make that showing.   Therefore, the

undersigned recommends that the district court deny a certificate of appealability in

its final order.

The second sentence of  Rule 11(a) provides:  "Before entering the final order,

the court may direct the parties to submit arguments on whether a certificate should

issue."  Thus, if there is an objection to this recommendation by either party, that

party may bring this argument to the attention of the district judge in the objections

permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.     That the amended petition for writ of habeas corpus (ECF No. 5) be

**DISMISSED with prejudice** as untimely.

2.     That a certificate of appealability be **DENIED**.

3.     That the clerk of court enter judgment accordingly and close this case.

At Pensacola, Florida, this 15<u>th</u> day of March 2022.


                              /s/ *Elizabeth M. Timothy*
                              **ELIZABETH M.  TIMOTHY**
                              **CHIEF UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control</u>.  An objecting party must serve a copy of the objections on all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**

Case No.:  3:21cv598/LAC/EMT